MeMEUNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

THE SCHOOL DISTRICT OF THE CITY
OF NIAGARA FALLS, NEW YORK,

                     Plaintiff / Counter-Defendant,

    v.                                **DECISION AND ORDER**
                                        08-CV-20S

CROSSPOINTE, LLC,

                     Defendant / Counter-Claimant.

## I. INTRODUCTION

The School District of Niagara Falls ("Niagara Falls") commenced this action against Defendants, CrossPointe, LLC, ("CrossPointe") on December 7, 2007 in New York State Supreme Court, County of Niagara, alleging claims for breach of contract. CrossPointe removed the action to this Court on January 10, 2008 on diversity grounds.[1] (Docket No. 1.) Presently before this Court are Crosspointe's (Docket No. 30) and Niagara Falls' (Docket No. 40) Motions for Summary Judgment. For the following reasons, CrossPointe's motion is granted in part and denied in part, while Niagara Falls' motion is denied.

## II. BACKGROUND

**A.    Facts**

The facts of this case are relatively straightforward. In 2004, Niagara Falls decided to upgrade its computer software because, in part, its old software was being discontinued.

---

[1] Plaintiff alleges, and Crosspointe agrees, that Niagara Falls has its principal place of business in New York, while Crosspointe is an Alabama Limited Liability Company with its principal place of business in Orlando, Florida. The amount in controversy is $1,647,000.00 (See Complaint, ¶¶ 1, 2, 29, 30; Docket No. 1, Exhibit A.; see also Notice of Removal, ¶¶ 5-7; Docket No. 1.)

(Defendant's Statement of Facts (Def.'s State."), ¶ 7; Docket No. 33.)[2] On January 26, 2005, Niagara Falls, through the Ulster County Board of Cooperative Educational Services ("BOCES"), entered into a Master Agreement ("Agreement") with and licensed new software from CrossPointe. (Id., ¶ 11.) Generally, Crosspointe agreed to provide Niagara Falls with software that was intended to manage payroll, human resource, personnel, and student records.[3] (Id., ¶ 14.)   In return, Niagara Falls contracted to pay CrossPointe $735,000 for software licensing fees, $150,000 for maintenance fees spread out through the first five years of implementation, and $537,000 in conversion fees.[4] (Id., ¶¶ 15-16.) Niagara Falls paid everything except the maintenance fees for the third, fourth, and fifth years, for a total of $1,347,000. BOCES reimbursed Niagara Falls for approximately 83 percent of the purchase price, making Niagara Falls' final share $228,990. (Id., 16.)

CrossPointe began to implement the software in early 2005, but the parties never formally agreed on a completion deadline for the project. (Id., 25.) Niagara Falls, however, claims that it expected the software to be completed "in a short duration," and thought that the product would be ready to work "out of the box." (Declaration of Darlene Sprague

---

[2]This Court has accepted facts included in Defendant's and Plaintiff's Statement of Facts to the extent that they have not controverted each other's statements. See Local Rule 56(a)(2) (statements of material fact that are not specifically controverted by the non-moving party are deemed admitted).

[3]Specifically it provided for the following: (1) CrossPointe Student Records OnLine (including the modules, Activities & Fees, Attendance, Conduct, Demographics, Grade Reporting, Health, Scheduling, Special Programs and Test Scores), (2) CrossPointe Human Resources OnLine (including the modules, Graphical User Interface, Applicant Tracking, Benefits Administration, Budgeting, Employee Records, Payroll, Position Control and Staff Development), (3) CrossPointe Financial Information OnLine (including the modules, Graphic User Interface, Accounts Payable, Bid Preparation, Budget Management, Financial Reporting, General Ledger and Purchasing), and (4) CrossPointe Supply Chain OnLine (including the modules, Capital Assets and Warehouse Operations). (Defendant's Statement of Facts, ¶ 14.)

[4]Conversion fees cover training, implementation, and data conversion. (Product Order Form, § 3; Docket No. 33-7.)

("Sprague Decl."), ¶ 4; Plaintiff's Statement of Facts (Pl.'s State."), ¶ 14; Docket No. 38.) Crosspointe disagrees with this characterization and notes that even Niagara Falls employees knew that implementation was a "process, as opposed to an event." (Defendant's Response to Pl.'s State., ¶ 14; Docket No. 46.)

By any account, the implementation was not completed in a short time period. In April of 2006, Niagara Falls Superintendent Carmen Granto started to become nervous that the project was not going smoothly because, at that time, the payroll software was still not functioning.[5] (Def.'s Stat., ¶ 25.) Because the project was taking longer than Niagara Falls expected, it set up a meeting with Crosspointe in August of 2006 to address its concerns. (Id., ¶ 25; Sprague Decl., ¶ 5.)

At the meeting, it appears that both parties collaborated to devise a new schedule, called the "Project Plan," which outlined specific deadlines for the installation of certain software components. (Def's State., ¶¶ 28-29, 30.) It is undisputed that the meeting was cooperative and that each party was satisfied with the outcome. (Id., ¶ 28.) Niagara Falls also formed a "Management Review Team," which included Darlene Sprague, Niagara Falls' Administer of Information Services, to oversee the Project Plan and meet weekly with Crosspointe's Project Manager, John Brophy. (Id., ¶ 25; Sprague Deposition, p. 6; Docket No. 33-4.)

Despite the parties' good intentions, Niagara Falls remained unhappy with the length of time that Crosspointe took to install the software. (Sprague Decl., ¶ 10.) In May of 2007, dissatisfied with CrossPointe and with none of Crosspointe's systems in use, Niagara Falls

---

[5] In fact, at no point did Niagara Falls ever utilize the CrossPointe software.

terminated the implementation process. (Def.'s State, ¶ 41; Pl.'s State., ¶¶ 8-11.) Niagara Falls subsequently purchased another software package from a separate company, Finance Manager. (Pl.'s State., ¶ 12.)

Because the Project Plan tracked CrossPointe's progress, it is relatively easy to determine precisely how far along it was in May 2007 when the project was terminated. (Id., ¶ 32.) At that time, 99 percent of the "Project Administration" tasks were marked as complete, while in the "Technical Implementation" phase, 82 percent of the tasks were marked as complete. (Id., ¶¶ 32-35.) However, overall, taking into account the "Finance" and "Student" phases, only 46 percent of the project was completed. (Pl.'s State., ¶ 7.) Crosspointe notes that it started with the "Technical Implementation" phase and was moving sequentially towards the "Student" phase when the project was cancelled. (Def.'s State., ¶ 38.)

Seven months later, in December of 2007, Niagara Falls sued CrossPointe in this action, claiming that it never successfully delivered the product.

**B.      The Agreement**

As noted above, the parties' rights and obligations are governed by the Agreement, which was signed in January 2005. Relevant selections from it follow.

Concerning warranties, the Agreements reads:

> THE WARRANTIES REFERENCED IN THIS AGREEMENT ARE IN LIEU OF ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. CROSSPOINTE DOES NOT WARRANT THAT THE SOFTWARE IS FREE OF NONMATERIAL DEFECTS. CROSSPOINTE DOES NOT REPRESENT THAT THE SYSTEM WILL MEET [NIAGARA FALLS'] REQUIREMENTS

> OR THAT THE OPERATION OF THE SOFTWARE WILL BE
> UNINTERRUPTED OR ERROR FREE.

(Agreement, § 7, Exhibit 3; Docket No. 33-6) (capitalization in original).

The "Remedies" section of the Agreement provides that:

> [The] exclusive remedies for breach of the Product Warranty
> or Support are: (a) CrossPointe will provide Support to repair
> or replace the Products to enable the Products to comply with
> the Product Warranty, (b) If CrossPointe does not comply with
> Section 9(a) within the cure period (as defined below),
> [Niagara] may recover direct damages for the CrossPointe
> Supported Products subject to the damage claim, including up
> to a refund of the License Fees or Service Fees paid by
> [Niagara Falls] to CrossPointe, subject to the time periods and
> limitations described in Section 14. . . .Cure Period means the
> period of time reasonably required after notice from Client for
> CrossPointe to cure a breach in accordance with CrossPointe's
> standard Support practices.

(Id., § 9.)

Referenced above, Section 14 limits Niagara Falls to direct damages, specifically excluding "indirect, incidental, punitive, exemplary, special or consequential damages . . . even if the other party has been advised of the possibility of such damages." (Id., § 14.) This section also requires each party to use reasonable efforts to mitigate its damages. (Id.) Further, if a claim arises in the first year after the product was ordered, Crosspointe's liability is limited to the license fee. (Id.) If a claim arises after that date, then CrossPointe's liability becomes even more limited, and amounts only to the most recent annual service fee. (Id.; Def.'s State., ¶ 15.)

Finally, of particular importance here, section 17 of the Agreement requires that in the event of a dispute:

> [E]ach of the Parties will appoint a designated representative
> to meet promptly in person or by telephone to attempt to

resolve in good faith any dispute concerning the Products, Support, Subscription Services, CrossPointe's invoices or the Agreement . . . No litigation, arbitration or other actions relating to the Products, Support, Subscription Services, CrossPointe's invoices or the Agreement may be brought: (a) if the injured Party has not participated or agreed to participate in the above meetings . . . The parties must comply with this Section 17 for any dispute, controversy or claim arising out or relating to the rights and obligations of a party under this Agreement or the validity, interpretation, breach or termination thereof, including claims seeking redress or asserting rights under applicable law.

(Agreement, § 17.)

## C.    Procedural History

Niagara Falls commenced this action against CrossPointe on December 7, 2007 in New York State Supreme Court, County of Niagara, alleging claims for breach of contract. (Docket No. 1.) CrossPointe removed the action to this Court on January 10, 2008 on diversity grounds. (Id.) The next day, CrossPointe filed an answer and four counterclaims. On February 7, 2008, Niagara Falls moved to remand the case to state court (Docket No. 7), but that motion was denied by the Honorable Jeremiah J. McCarthy on March 12, 2008. (Docket No. 13.) On June 29, 2009, CrossPointe moved for summary judgment as to Niagara Falls' claims.[6]   (Docket No. 30.) On August 12, 2009, Niagara Falls filed its opposition to CrossPointe's motion and, in conjunction, filed its own motion for summary judgment. (Docket No. 40.)

---

[6]CrossPointe has not moved for summary judgment on its counterclaims.

### III.  DISCUSSION

**A.**     **Summary Judgment Standard**

Rule 56 of the Federal Rules of Civil Procedure provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A fact is "material" only if it "might affect the outcome of the suit under governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). A "genuine" dispute exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Id.  In determining whether a genuine dispute regarding a material fact exists, the evidence and the inferences drawn from the evidence "must be viewed in the light most favorable to the party opposing the motion." Adickes v. S. H. Kress & Co., 398 U.S. 144, 158–59, 90 S. Ct.1598, 1609, 26 L. Ed. 2d 142 (1970) (internal quotations and citation omitted); see also Fed. R. Civ. P. 56(c).

"Only when reasonable minds could not differ as to the import of evidence is summary judgment proper." Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991) (citation omitted). Indeed, "[i]f, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper." Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 82-83 (2d Cir. 2004) (citations omitted).  The function of the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  Anderson, 477 U.S. at 249.

When the parties cross-move for summary judgment, "the standard is the same as that for individual motions for summary judgment." Natural Res. Def. Council v. Evans, 254

F. Supp. 2d 434, 438 (S.D.N.Y. 2003). "The court must consider each motion independently of the other and, when evaluating each, the court must consider the facts in the light most favorable to the non-moving party." Id. (citing Morales v. Quintel Entm't, Inc., 249 F.3d 115, 121 (2d Cir. 2001)).

## B.    Motions for Summary Judgment

CrossPointe raises several arguments in support of its motion for summary judgment. First, it argues that Niagara Falls' claim should be dismissed because it failed to appoint a representative and hold a meeting, under section 17 of the Agreement, before commencing this litigation. Second, and alternatively, it seeks to limit Niagara Falls' award to $50,000 – the amount Niagara Falls paid as its second year maintenance fees. Third, it argues that Niagara Falls did not provide CrossPointe adequate time to repair or replace the software, and finally, it argues that Niagara Falls cannot claim as damages any expenses that were reimbursed by BOCES.[7]

In opposition, and in support of its own motion, Niagara Falls argues that the August 16, 2006 meeting served as its contractually mandated "good faith meeting"; that it provided two and half years for CrossPointe to repair its software; and that the product was never delivered, such that its damages should not be limited to its second year fee.[8]

Each of these issues will be addressed below.

---

[7] CrossPointe also argues that this Court should disregard the affidavits submitted by Niagara Falls because they were not properly executed. However, Niagara Falls cured this issue through James C. Rossetti's declaration. (Docket No. 52.)

[8] Apparently under the incorrect impression that CrossPointe has moved for summary judgment on its counterclaims, Niagara Falls argues that summary judgment would be improper as to those claims because it has not had an opportunity to depose CrossPointe's CEO, Joan Keebler. In any event, this is not the proper arena to raise such an issue since Niagara Falls has not filed a motion to compel discovery under Federal Rules of Civil Procedure 37. Further, Niagara Falls could have taken Keebler's deposition under Federal Rules of Civil Procedure 30(b)(6), but failed to do so.

### 1.      Good Faith Meeting

Section 17 of the Agreement compels each party to appoint a designated representative to meet in an effort to resolve, in good faith, any disputes that arise between the parties. It prohibits litigation unless the parties hold such a meeting.[9]  There is no dispute that this language, creating a condition precedent to suit, is valid and binding on the parties. Rather, CrossPointe claims that no such meeting occurred, noting that on June 20, 2007, after it learned about Niagara Falls' decision to terminate the installation of its product, it sent a letter to BOCES' legal counsel attempting to set up a Section 17 meeting and that Niagara Falls "ignored" this letter. Niagara Falls argues that the August 16, 2006 meeting satisfied its duty under Section 17.

This Court agrees with Niagara Falls. Despite the passage of almost a year from the August 16, 2006 meeting to Niagara Falls' decision to terminate the contract with CrossPointe, that meeting sufficiently satisfied the requirement set out in Section 17. Significantly, the Agreement does not specify any temporal proximity between the meeting and the commencement of litigation, compelling only that a meeting be held, not when it should be held.

Further, as required by Section 17, Niagara Falls has presented sufficient evidence that the August 16, 2006 meeting was held due to a dispute concerning CrossPointe's product. In other words, it was not merely a garden variety meeting to which Niagara Falls is now trying to ascribe special significance. CrossPointe began work at Niagara Falls well

---

[9]The Agreement also permits each party to request that the other party meet again within 15 days if the first meeting was unsuccessful. But, as noted by Niagara Falls, this language is explicitly optional. It reads that "either Party *may* request" such a meeting. (Agreement, § 17) (emphasis added). Therefore, it does not create a mandatory condition precedent to suit.

over a year and a half before the meeting, and, according to Niagara Falls, very little had been accomplished. At the August meeting, Superintendent Granto expressed his displeasure about the progress that CrossPointe had made. When Niagara Falls remained displeased in May of 2007, for the same reasons it was upset in August of 2006, it was not required, under the Agreement,  to call yet another meeting. Moreover, there is no dispute that the required representatives, including Granto and Crosspointe's CEO, Joan Keebler, attended the meeting.

Because "[i]t is the role of the courts to enforce the agreement made by the parties – not to add, excise or distort the meaning of the terms they chose to include," this Court finds that Niagara Falls, as detailed by the plain terms of the Agreement, has satisfied the condition precedent to bringing suit. See NML Capital v. Republic of Argentina, 17 N.Y.3d 250, 259-60, 952 N.E.2d 482, 928 N.Y.S.2d 666 (2011) (internal citations omitted).[10] Therefore, CrossPointe's motion for summary judgment on this issue is denied.

### 2.    Available Remedies

CrossPointe argues that it did not receive notice from Niagara Falls that it was in breach and that Niagara Falls did not provide a reasonable time to cure any defects in the software. Pursuant to Section 9, in the event of a defect, Niagara Falls' remedies were limited to the repair or replacement of the product. If CrossPointe failed to comply with this warranty within the cure period, which is defined in the Agreement as a time "reasonably required" to cure the breach, then Niagara Falls would be able to recover full, direct damages.

---

[10]Section 20(d) of the Agreement specifies that any action arising out of the Agreement shall be governed by New York law.

This dispute presents a case where reasonable minds can differ. Each parties' argument rests on a different characterization of the August 16, 2006 meeting and the events following it. CrossPointe characterizes this meeting as a turning point in the relationship between the two parties. It notes that each party was satisfied with the outcome and that, thereafter, the parties worked together in implementing the software. With the Project Plan going forward, and no new notice from Niagara Falls that it was dissatisfied with its progress, it argues that Niagara Falls cannot assert a claim for damages because it never provided notice of any defect.

Niagara Falls paints a different picture. It claims that it remained dissatisfied with Crosspointe's progress and that in May of 2007, after two and half years of work and with the project only 46% complete, its continued dissatisfaction motivated it to decide to terminate the project. (Sprague Decl., ¶ 10.) It argues that the August 16, 2006 meeting served as notice that the product was defective.

Each party has proffered a reasonable interpretation of the events leading up to the May 2007 decision. On one hand, the decision to terminate was made almost a year after the August 16 meeting and testimony from Niagara Falls' Superintendent confirms that he was satisfied with the outcome of that meeting. (Granto Dep., p. 37-40.) Further, during the time period between the 2006 meeting and the decision to terminate, the partes were working cooperatively to implement the system and resolve issues as they arose. (Sprague Dep., p. 150-151.)

On the other hand, progress was very slow and after two and a half years, Niagara Falls was never able to use the product for which it had paid a significant sum. Moreover, CrossPointe does not dispute that the software was never fully operational. In fact, its only

evidence that the system worked is that it was implemented in two other school districts. (Def's State., ¶ 49.)

These issues are not suitable for adjudication at the summary judgment stage where a court may not weigh the facts but must only determine if the non-moving party has raised any genuine issues of material fact. See Anderson, 477 U.S. at 249. Both parties, in opposing each other's motions, have met that burden: it is for the fact finder to determine whether the August 16, 2006 meeting satisfied the notice requirement, which version of events is accurate, and whether the 2007 decision to terminate the project allowed CrossPointe a reasonable amount of time to cure.[11] See Fed. Ins. Co. v. Am. Home Assur. Co., 639 F.3d 557, 567 (2d Cir. 2011) (finding that "contract claims are generally not subject to summary judgment if the resolution of a dispute turns on the meaning of an ambiguous term or phrase," such as "reasonable"). Accordingly, each parties' motion for summary judgment on this issue is denied.

### 3. Limitations on Damages

#### i. *Second Year Maintenance Fees*

CrossPointe also seeks to limit Niagara Falls' damages to $50,000 pursuant to Section 14 of the Agreement, which restricts damages to the most recent annual service fee if the claim arose after the first year of the date of the Order Form (signed by Niagara Falls on January 26, 2005). (See Order Form, p. 3; Docket No. 33-7.) Although this claim was undisputedly filed after one year had elapsed from the date of the Order Form, it is possible that it may have *arose* in the first year. This is not a case where the software was

---

[11] Neither party points to any industry practice or custom that could assist in assigning a more definitive time-frame to this term.

installed, working properly, and then, at some later date, failed. Instead, Niagara Falls has brought sufficient evidence to withstand summary judgment that the system they purchased never worked. A reasonable jury could conclude that the claim arose immediately after the Agreement was signed, since it was at this time that CrossPointe began its alleged breach. As such, Niagara Falls' damages would not be limited to its latest service fee, but would also include, pursuant to the Agreement, any license fees it paid. Thus, CrossPointe's available damages cannot be limited to $50,000.

CrossPointe, however, argues that Niagara Falls has conceded that its claim arose after the first year. In support of this contention, CrossPointe cites Niagara Falls' Memorandum in Opposition to Summary Judgment where it writes that its "dissatisfaction with the product and its pace of installation and ability to work" occurred "in the summer of 2006" – more than one year after the date of the Order Form. (See Defendants' Reply Memorandum, p. 10; Docket No. 47.) However, merely because Niagara Falls dissatisfaction began in 2006 does not mean, *ipso facto*, that its claim arose at the same time. As noted above, if the fact-finder credits Niagara Falls' evidence that the system never worked properly, the fact-finder is also entitled to find that the claim arose within the first year.[12] Thus, CrossPointe's motion on this issue is denied.

### ii.   *Reimbursement and Consequential Damages*

CrossPointe further argues that Niagara Falls should not be able to claim as damages any expenses it incurred that were ultimately reimbursed by BOCES. In support of this contention, CrossPointe relies on <u>Mistretta v Guevarez</u>, 15 Misc. 3d 1129(A), 841

---

[12]A contrary finding would render this section of the Agreement unreasonable: CrossPointe could insulate itself from a significant amount of damages by merely delaying successful installation of its product for a year.

N.Y.S.2d 219 (Table) (N.Y. Sup. 2007) and <u>Kearney v Fahey</u>, 3 Misc. 3d 131(A), 787 N.Y.S.2d 678 (Table) (N.Y. Sup. App. Term 2004). However, those cases involved actions for personal injury and property damage. Under New York's Civil Procedure Law and Rules ("CPLR"), damages are deducted in equal proportion to the amount that the plaintiff was reimbursed by a collateral source, but only in actions for personal injury, injury to property, and wrongful death. CPLR § 4545. This provision is inapplicable in this contract action. Here, there is no dispute that Niagara Falls paid CrossPointe $1,347,000. (Stipulation; Docket No. 33-11.)  That some of this payment was eventually reimbursed by BOCES does not diminish CrossPointe's liability. Any resulting "windfall" may be limited by an action between BOCES and Niagara Falls.

CrossPointe also argues that, pursuant to the Agreement, Niagara Falls is limited to direct damages and cannot assert claims for consequential damages. This Court agrees. The Agreement states clearly that "in no event will CrossPointe . . . be liable for indirect, incidental, punitive, exemplary, special or consequential damages." (Agreement, § 14.) As such, Niagara Falls' request for $350,000 in damages suffered while "attempting to work on the [CrossPointe] system" is plainly a claim for consequential damages and is thus barred by the terms of the Agreement . (<u>See</u> Complaint, Wherefore Clause; Docket No. 1.)

## IV. CONCLUSION

For the reasons discussed above, CrossPointe's motion is granted regarding the portion that seeks to limit Niagara Falls to direct damages. It is denied in all other respects.

Niagara Falls' motion is denied in its entirety.

## V. ORDERS

IT HEREBY IS ORDERED, that Defendant's Motion for Summary Judgment (Docket No. 30) is GRANTED in part and DENIED in part.

FURTHER, that Plaintiff's Motion for Summary Judgment (Docket No. 40) is DENIED.

Dated:        December 10, 2011
              Buffalo, New York

                                              /s/William M. Skretny
                                              WILLIAM M. SKRETNY
                                                    Chief Judge
                                            United States District Court